740 So.2d 675 (1999)
STATE of Louisiana, Appellee,
v.
Myron SMITH, Appellant.
No. 31,955-KA
Court of Appeal of Louisiana, Second Circuit.
May 5, 1999.
*677 Daryl Gold, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul Carmouche, District Attorney, B. Woodrow Nesbitt, Jr., Assistant District Attorney, Counsel for Appellee.
Before STEWART, GASKINS and DREW, JJ.
GASKINS, J.
The defendant, Myron Smith, was convicted of first degree murder in the shooting death of 14-year-old Andre Brooks and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. He appeals. For the reasons set forth below, we affirm the defendant's conviction and sentence.

FACTS
On November 4, 1995, the defendant and several friendsTyrone Pickrom, Gary Griffin, and Chance Lewisattended a party at an apartment complex. Shortly before 11:00 p.m., the group, apparently members of the Blood gang, left the party together and drove back to Pickrom's home at 1206 Crestmoor, in the Cherokee Park neighborhood, in a friend's borrowed car.
En route, they passed 418 Braebrook, the residence of the Johnson family, where members of a rival gang, the Crips (also referred to as the "Rollin' 60s"), were standing in the front yard. Allegedly, *678 shots were fired from the front yard of the Johnson house at the car in which the defendant was a passenger, shattering the rear window. No one was injured.
After the shots were fired, the defendant jumped out of the car and ran to a relative's nearby residence, located on the corner of Braebrook and Crestmoor. The defendant remained there briefly; he then left that house and went to Pickrom's home on Crestmoor.
The car that sustained the bullet damage belonged to Kenny West, who was at the Pickrom house that night. Also present were Tyrone Pickrom's siblings, Yolanda and Henry, as well as Henry's girl friend, Devonda Grundy, and Yolanda's friend, LaChandra "China Doll" Johnson.
West saw the defendant, wearing a white Kansas City Chiefs jacket, and Pickrom, wearing a red San Francisco 49ers jacket, enter the Pickrom residence together. They were "pumped up," angry and upset. They retrieved an assault rifle and left, heading toward Braebrook Street. China Doll also testified that she saw the defendant wearing the white jacket in the Pickrom home immediately before the shootings occurred.
Meanwhile, the Crips in the front yard of the Johnson home had departed in the Cadillac which had been parked in front of the house. Witnesses estimated that approximately 10 minutes passed between the time that the Crips left and the time that the defendant and Pickrom returned to the Johnson home.
Present in the Johnson residence were seven children: Dahjah Johnson, age 9; Tatenishia "Punkin" Johnson, age 11; Rekita Johnson, age 17; Tchaikovsky "Tweety Bird" Johnson, age 15; Joseph Levingston, age 16; Degetrion Scott, age 15; and the victim, Andre Brooks, age 14. The four Johnson children were siblings; the three other boys were friends of Tweety Bird. (China Doll Johnson, age 13, was another of the Johnson siblings.) The mother of the Johnson children, a medical assistant at Willis-Knighton Medical Center, was working a 3-to-11 p.m. shift.
Immediately before the shooting, the children were in the living room of the house watching television. Degetrion Scott looked out the front window on two occasions. The first time, he teasingly turned to the other children and said, "They're fixing to shoot." (He was attempting to joke about the earlier shooting incident.) A few minutes later, he looked out the front window again and saw someone wearing a white Kansas City Chiefs jacket and holding a rifle. Degetrion frantically yelled, "They're going to shoot," and grabbed the two youngest children, Punkin and Dahjah, to protect them.
The Johnson house was strafed by two separate barrages of automatic gunfire, several seconds apart. The children testified that the bullets came from every angle as they desperately scrambled to find shelter. The older children pushed the younger ones to the floor and threw themselves across them to shield them from the bullets. When the shooting finally ended, the other children saw Andre lying on the floor surrounded by blood, convulsing, choking and gagging. One of the older children called 911 for assistance. Andre died at the scene of a single gunshot wound to the head.
Several minutes after the gunshots ceased, the defendant and Pickrom, joined by Griffin, returned to the Pickrom residence on Crestmoor. While West testified that the defendant returned holding the gun, China Doll Johnson testified that the only person she saw with the gun was Tyrone Pickrom.
Griffin, Pickrom and the defendant then left the Pickrom home and went to the residence of Carl Chambers, a close friend of the defendant who lived a street over from Braebrook. Chambers testified that, at their request, he drove them out of the neighborhood and dropped them off at other locations. In his trial testimony, Chambers admitted that when he initially spoke *679 to the police, he informed them that the defendant had told him on the night of the incident that he had been involved in the shooting on Braebrook and that "someone was hurt."[1]
Several days after the shooting, the murder weapon was recovered from a storage shed at the Pickrom residence. It had been placed there by Steve Flakes, the Pickrom's next door neighbor, who had found the rifle in his storage room after the defendant telephoned and told him of its location. Flakes testified that during the course of their telephone conversation, the defendant told him that someone had been shot. In answer to Flakes' inquiry as to what happened, the defendant stated that both he and Tyrone Pickrom were involved, that he had shot the gun two times and then handed it to Pickrom who emptied the clip.
Flakes also testified that he received a call from Pickrom, during which Pickrom assured him that someone would come to Flakes' house and retrieve the weapon. Flakes testified that Pickrom told him, during this call, that he thought he had killed someone.
This weapon was examined and tested by a firearm expert who determined that it fired the bullet recovered by the coroner from Andre Brooks' clothing.[2] It was also positively matched to one of the three bullets recovered from inside the Johnson home. Furthermore, the 13 fired cartridge casings found outside of the Johnson house and the other bullets recovered from inside the house were determined to have the same class characteristics as test bullets fired from this particular assault weapon.
Bonita Stinson, a friend of the defendant, testified that the white Kansas City Chiefs jacket, worn by the defendant on the night of the shooting, originally belonged to her. Ms. Stinson loaned it to the defendant before the shooting. Several days after the shooting, she gave the defendantwho was wearing the jacketa ride to a job interview. After she dropped him off at his home, she drove to a service station and cleaned out her car before leaving it for repairs. While cleaning out her car, she discovered the jacket on the floorboard in the back seat, mixed in with some other clothes.
In the early morning hours of November 9, 1995, the police went to the home of the defendant's parents to execute search and arrest warrants, but the defendant was not there. Aware that the police were looking for him, the defendant went to the police station where he gave a voluntary statement in which he admitted that he was wearing a white Kansas City Chiefs jacket on the night of the shooting.
During the course of his police statement, the defendant gave two different accounts. In his initial version of the events, he stated that, after the car he was riding in was shot at by the Crips, he got out of the car and went to his cousin's house where he remained for a few minutes. He then went to the Pickrom house, where he encountered Kenny West and Tyrone Pickrom arguing about the car and the back window. When the defendant could not get anyone to listen to him about their promise to go back to the party to pick up a friend, he went to Carl Chambers' house. The defendant stated that he made a phone call to his girlfriend while he was at the Chambers residence. She told him that she had heard from a relative who worked for the local 911 service that someone had been shot. The defendant stated that he remained at the Chambers' *680 house for about 40 to 50 minutes and then had Chambers take him to another girl's home in Stoner Hill.
After the detectives informed him that they could place him at the crime scene during the shooting, the defendant then changed his story. He told them that after he left his cousin's house, he saw Tyrone Pickrom heading down Braebrook with a gun. The defendant walked with him to the Johnson house, believing that Pickrom was going to tell the residents there not to have the Crips around any more. When he heard the first shot, he got scared and ran off, heading back to the Pickrom residence. The defendant stated that the curtains at the Johnson residence were closed but there was a light on inside. He also admitted that he was aware that several children between the ages of 10 and 17 lived in the house. Finally, the defendant stated that he went to Chambers' house, called his girlfriend who had heard that someone was killed in a shooting, and then had Chambers take him to the Stoner Hill area.
The defendant was charged with first degree murder in the death of Andre Brooks, and the state sought the death penalty.[3] Following a jury trial in February 1997, he was convicted as charged but was sentenced to life imprisonment. His motion for modification of the verdict was denied.
The defendant appealed. Although he originally raised 13 assignments of error, four assignments were not briefed and are thus deemed waived. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La. 1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990).

MOTION FOR MODIFICATION OF VERDICT
In this assignment of error, the defendant challenges the sufficiency of the evidence, arguing that his conviction should be reduced from first degree murder to manslaughter. When the defendant challenges both the sufficiency of the evidence and one or more trial errors, the reviewing court will first review the sufficiency of the evidence, as a failure to satisfy the standards of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), will moot the trial errors. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bullard, 29,662 (La.App.2d Cir.9/24/97), 700 So.2d 1051. The criterion for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the state proved all elements of the crime beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Clower, 30,745 (La.App.2d Cir.6/24/98), 715 So.2d 101. That standard, initially enunciated in Jackson and now legislatively embodied within La. C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Clower, supra; State v. Smith, 441 So.2d 739 (La.1983); State v. Perry, 612 So.2d 986 (La.App. 2d Cir. 1993).
It is always the function of the judge or jury to assess the credibility of witnesses and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La. App. 2d Cir.1992), writ denied, 617 So.2d 905 (La.1993). Where a trier of fact has made a rational determination, an appellate court should not disturb it. Indeed, in the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if *681 believed by the trier of fact, is sufficient support for the requisite factual conclusion. State v. Clower, supra; State v. Thomas, supra; State v. Combs, 600 So.2d 751 (La.App. 2d Cir.1992), writ denied, 604 So.2d 973 (La.1992).
In relevant part, La. R.S. 14:30 defines first degree murder as follows:
A. First degree murder is the killing of a human being:
. . . .
(3) When the offender has the specific intent to kill or inflict great bodily harm upon more than one person.
Manslaughter is a homicide which would be either first degree murder or second degree murder but the offense is committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control or cool reflection. "Sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection are not elements of the crime of manslaughter. They are mitigating factors in the nature of a defense that exhibit a degree of culpability lower than that present when a homicide is committed without them. La. R.S. 14:31; State v. Lewis, 28,973 (La.App.2d Cir.12/11/96), 685 So.2d 1130, writ denied, 97-0122 (La.5/16/97), 693 So.2d 797.
In his motion, the defendant argued that his conviction should be reduced to manslaughter for several reasons. They are: (1) his co-defendant, Tyrone Pickrom, was only found guilty of manslaughter; (2) the witnesses gave different testimony in each defendant's trial; (3) the evidence indicated that the co-defendant was the main culprit; (4) the evidence did not support a conviction for first or second degree murder; and (5) the defendant did not have specific intent.
As previously noted, Pickrom stood trial for the death of Andre Brooks on a charge of second degree murder. He was convicted of manslaughter and sentenced to 30 years. The defendant argues that his verdict should be reduced to manslaughter because he and Pickrom were co-defendants, accused of the same crime. They were not tried together and did not testify at each other's trial.
The facts deduced at the defendant's trial show that he was a passenger in the car that was shot at by people in the front yard of the Johnson house shortly before that house was pummeled with the gunfire which killed Andre Brooks. It is undisputed that the people who fired the shots at the car left almost immediately afterwards in their Cadillac which had been parked in front of the Johnson house. All of the children at that residence were gathered together in the front room, with the lights and the television on.
Degetrion Scott testified that he looked out of the front window only moments before the shooting began and saw a white Kansas City Chiefs jacket and a rifle on the arm of the person wearing the jacket. He saw the person with the rifle preparing to aim it at the house just before the shooting began.
China Doll Johnson, Kenny West, and the defendant himself (via his police statement) said that the defendant was wearing the white Kansas City Chiefs jacket when he left the Pickrom residence, as well as when he returned moments after the shooting ceased. The defendant's friend, Bonita Stinson, testified that the white Kansas City Chiefs jacket, worn by the defendant on the night of the shooting, was recovered from her car after the shooting.
Carl Chambers, a close friend of the defendant, testified that he gave the defendant, Pickrom and Griffin a ride out of the neighborhood. He told the police that the defendant said that he had been involved in a shooting on Braebrook and that "someone was hurt." Steven Flakes also testified to a confession made by the defendant about his involvement in the shootings, including the fact that he shot the *682 gun two times before handing it off to Pickrom.
While it is true that Pickrom was convicted of manslaughter for the same crime, it is clear that there was sufficient evidence presented at this defendant's trial including eyewitness testimony placing the defendant at the crime scene, shooting into a house full of children, as well as several admissions made by the defendantto convict the defendant of first degree murder. The defendant argues that his verdict should also be reduced to manslaughter, but cites no case law in support of this proposition. In State v. Ryan, 122 La. 1095, 48 So. 537 (1909), the supreme court held that different dispositions can be rendered in different trials against co-defendants for the same offense.
We will not reduce the defendant's verdict to manslaughter simply because his co-defendant, who was tried separately, was convicted only of manslaughter. This court must not automatically discount the trial testimony of the witnesses and the evidence presented to the jury in this matter, which resulted in a verdict of first degree murder. The facts and evidence presented in this trial were clearly sufficient to support the jury's first degree murder verdict.
The defendant also argued that witnesses testified differently at the trial of Pickrom than they did at the instant trial. However, the defendant has provided no factual support for this argument. He has not even identified which witnesses and how their testimony differed. Therefore, we have nothing to review as to this argument.
The defendant next claims that the verdict should be reduced because Pickrom was the main culprit and because there is no evidence to support a conviction of first or second degree murder. There was sufficient evidence presented at the trial of this matter such that the fact finder was able to find the defendant guilty of first degree murder. The defendant was identified as a shooter based on his jacket, and he made several admissions regarding his involvement in the shootings. The evidence sufficiently shows that the defendant was a culprit in this matter.
Finally, the defendant contends that the state did not prove specific intent. Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Williamson, 27,871 (La. App.2d Cir.4/3/96), 671 So.2d 1208, writ denied, 96-1143 (La.10/4/96), 679 So.2d 1380; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526; State v. Johnson, 27,522 (La.App.2d Cir.12/6/95), 665 So.2d 1237.
It is clear that the specific intent that is needed to support the defendant's conviction for first degree murder was established by the defendant taking a loaded assault rifle and shooting it multiple times into a house full of children, killing miraculously only one person. The defendant told the police he knew that the Cadillac containing the individuals who had shot at him earlier left the premises of the Johnson residence before he and Pickrom arrived with a loaded gun. The defendant admitted that he knew several children between the ages of 10 to 17 lived in that house. He also conceded that when he and Pickrom arrived at the house, no one was in the front yard, but he saw a light on inside of the house. The defendant clearly had specific intent. State v. Butler, 618 So.2d 572 (La.App. 2d Cir.1993), writ denied, 624 So.2d 1226 (La.1993).
This assignment lacks merit.

VOIR DIRE
Five of the defendant's assignments of error address matters arising during voir dire, including challenges for cause on various prospective jurors.

*683 Prosecution informing prospective jurors of parole possibility

The defendant argues that the trial court erred in denying his motion for mistrial after the prosecutor informed potential jurors that the penalty for manslaughter carried a possibility of parole.
The prosecutor's exact statement was as follows:
If you convict the defendant in a first degree murder case of anything other than first degree murder, you have no other function. The judge will impose the penalty of second degree murder, which is the same as a non-death penalty first degree murder, life imprisonment with no parole. If you convict a defendant of manslaughter, you are then discharged and ultimately the judge will impose a penalty of up to forty years at hard labor with parole if the person is convicted of the offense of manslaughter.
La.C.Cr.P. art. 775 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
A mistrial is a drastic remedy which should be declared only when unnecessary prejudice results to the accused. State v. Smith, 430 So.2d 31 (La.1983); State v. Alexander, 351 So.2d 505 (La. 1977); State v. Harris, 28,517 (La.App.2d Cir.8/21/96), 679 So.2d 549, writ denied, 96-2954 (La.9/26/97), 701 So.2d 975; State v. Powell, 598 So.2d 454 (La.App. 2d Cir. 1992), writ denied, 605 So.2d 1089 (La. 1992). The prohibition against discussion of the possibility of an offender's future release is not limited to the sentencing phase of a capital case, but extends to voir dire. State v. Byrne, 483 So.2d 564 (La. 1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Copeland, 419 So.2d 899 (La.1982). However, not every mention of the possibility of pardon or commutation of sentence made during the trial constitutes reversible error. State v. Byrne, supra.[4]
The statements made by the prosecutor in the instant matter defined the crime with which the defendant was charged, along with the responsive verdicts, the elements for each and the resulting penalties. The information was provided on one occasion to one panel of prospective jurors on February 11, 1997, six days before the trial began on February 17, 1997, and 10 days before the defendant was convicted of first degree murder. There was no impermissible mention by the prosecutor of the chance of pardon or commutation by the governor, but simply an accurate statement of the crimes and their resulting penalties. Furthermore, there is no showing by the defendant that the statement by the prosecutor prejudiced the defendant or misguided the jury by introducing inappropriate considerations.
This assignment of error lacks merit.

Granting of challenge for cause
In this assignment of error, the defendant contends that the trial court erred in granting the state's challenge for cause on prospective juror Laverne Buffin.
Following a response by Ms. Buffin that she believed that she would be unable to vote for the death penalty, despite any evidence presented at trial, the state challenged her for cause, and the challenge was granted. At the conclusion of jury selection in this case, the minutes reflect that the state had used only four peremptory challenges.
*684 In pertinent part, La.C.Cr.P. art. 799 provides:
In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant. In all other cases, each defendant shall have six peremptory challenges, and the state six for each defendant.
Objections to rulings on challenges for cause are governed by La.C.Cr.P. art. 800 which provides, in relevant part:
B. The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to by law.
In this case, the defendant has no grounds to complain about this challenge for cause. The effect of the trial court's ruling in no way provided the state with more peremptory challenges than it was entitled to by law. State v. Prince, 29,208 (La.App.2d Cir.1/24/97), 688 So.2d 643, modified on other grounds, 97-0727 (La.9/26/97), 701 So.2d 965; State v. Vergo, 594 So.2d 1360 (La.App. 2d Cir.1992), writ denied, 598 So.2d 373 (La.1992).
This assignment is without merit.

Denial of challenge for cause
In two assignments of error, the defendant complains that the trial court erred in denying his challenges for cause on two prospective jurors, Jerald Thomas and Jerry Alfrey. However, careful examination of the record reveals that when the challenges for cause were reurged by the defense, they were granted. Both of these prospective jurors were, in fact, excused for cause at the behest of the defense.
Consequently, we find no merit to these assignments.

Motion to disqualify potential jurors due to incorrect instruction
The defendant asserts that the trial court erred in denying his motion to disqualify a panel of potential jurors after the prosecutor gave them an incorrect instruction on the nature of character evidence. Since no motion for mistrial was made, we will treat this as a motion to disqualify these four prospective jurors for cause.
To establish reversible error on a denial of a challenge for cause, an accused need not only demonstrate an erroneous ruling, but also that he, as occurred here, exhausted his peremptory challenges before completion of the jury panel. State v. Lee, 93-2810 (La.5/23/94), 637 So.2d 102; State v. Plater, 26,252 (La. App.2d Cir.9/21/94), 643 So.2d 313, writ denied, 94-2608 (La.2/3/95), 649 So.2d 402; State v. Scriber, 605 So.2d 661 (La.App. 2d Cir.1992). The trial court is vested with broad discretion in ruling on a challenge for cause, and its decision will not be disturbed on appeal absent a showing of abuse of that discretion. State v. Lee, supra; State v. Warren, 28,889 (La.App.2d Cir.12/11/96), 712 So.2d 500; State v. Plater, supra, State v. Scriber, supra; State v. Johnson, 595 So.2d 789 (La.App. 2d Cir. 1992).
La.C.Cr.P. art. 787 provides, in pertinent part:
The court may disqualify a prospective petit juror from service in a particular case when for any reason doubt exists as to the competency of the prospective juror to serve in the case.
The defendant contends that the prosecutor gave the prospective jurors in question information about the defendant's character in violation of La. C.E. art. 404(B). La. C.E. art. 404(B) provides in pertinent part:
(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he *685 acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
The conduct about which the defendant complains was an explanation by the prosecutor of the difference in character and propensities in the penalty phase as opposed to the type of character evidence that might be introducedand when that evidence may be introducedin the guilt phase of the trial. While the prosecutor's statements and examples regarding the kind of character evidence that was allowable during the guilt phase of the trial, as opposed to the penalty phase of the trial, touched on the area of character evidence, La. C.E. art. 404(B) was not violated. The prosecutor never mentioned the defendant or any crimes, wrong acts or other character issues specifically concerning this defendant.
The court denied the defendant's motion to excuse the whole jury panel for cause but, at the defendant's request, asked the prosecutor not to make the same remarks again. The court then asked if the defendant wanted the court to give an admonition to the potential jurors. The defendant declined the court's offer. An admonition by the court would likely have cured any potential prejudice. However, the defendant failed to take advantage of the court's offer, and an admonition is only available upon request. La. C.Cr.P. art. 771; State v. Hattaway, 28,060 (La.App.2d Cir.5/8/96), 674 So.2d 380, writ denied, 96-1900 (La.1/10/97), 685 So.2d 141.
This assignment is meritless.

IMPROPER OPENING STATEMENT
The defendant maintains that the trial court erred in denying his motion for mistrial in which he asserted that the prosecutor made improper and prejudicial comments during his opening statement. He takes issue with the entire opening statement of the prosecutor, giving one specific example and requesting that we examine the entire opening statement for improprieties.
The portion of the opening statement of which the defendant specifically complains in brief is as follows:
You can lack the integrity and lack the courage and you cannot do what justice will demand your duty is, to tell this killer that you and other people like you who do what you did here get the death sentence; or, or, six months later they'll say, "He'd be in jail." Who is Mr. Smith?
The defendant then made a motion for mistrial, arguing that the prosecutor's entire opening statement was nothing more than an appeal to passion, prejudice and sympathy and was an effort to make the jurors feel guilty if they did not vote to convict. The motion was denied.
Prior to the commencement of the prosecutor's opening statement, the court provided the jurors with preliminary instructions, including one concerning opening statements:
First, the State will make its opening statement. The Defense Counsel may then make its statement, if he chooses to do so. The opening statements are not evidence. Simply, the Attorneys will present to you what they believe the evidence will show.
Further, after an objection by the defendant during the course of the prosecutor's opening statement, the court again cautioned the jurors that "... what the Attorneys *686 say is not evidence. The evidence comes from the witness stand. You may observe and listen and recall with your own memory what the evidence is." After the defendant's motion for mistrial was denied at the conclusion of the prosecution's opening statement, the defendant requested an admonishment be given to the jury. Consequently, the court gave the following admonishment before the defendant began his opening statement:
All right. Ladies and Gentlemen, let me admonish you that what the Attorneys say is not evidence. The evidence comes from the witness stand and items introduced and accepted by the Court as evidence. Also the law in this case will be given to you by me. Thank you very much.
The ordering of a mistrial is a drastic remedy and, except in instances in which it is mandatory, is only warranted if substantial prejudice results which deprives the defendant of a fair trial. Moreover, the trial court's rulings with regard to the scope of the opening statement should not be disturbed absent a manifest abuse of discretion. State v. Warren, supra.
Upon review of the opening statement in its entirety, we do not find that the prosecutor's comments rose to the level of preventing a fair trial, thus warranting a mistrial. Additionally, there were several admonitions given by the court that cured any potential prejudice.
This assignment is without merit.

IMPROPER CLOSING ARGUMENT
In two assignments of error, the defendant contends that the trial court erred in denying his motions for mistrial based upon improper closing arguments by the prosecution.
The defendant does not specify what statements in the prosecutor's closing argument he believes entitle him to a mistrial in this matter. It appears, in the first instance, that the defendant made a motion for mistrial, based on his belief that the prosecutor was about to make a statement to the jury about "sending a message." The second instance appears to be the motion for mistrial made by the defendant during the state's rebuttal argument concerning the prosecutor's appeal to the jury's sympathy and passion.
A prosecutor retains considerable latitude in making closing arguments. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996); State v. Byrne, supra. Even when a court has found that a prosecutor has exceeded that latitude, it has often criticized the improper arguments without finding that they constituted reversible error. State v. Taylor, supra; State v. Byrne, supra; State v. Jarman, 445 So.2d 1184 (La.1984); State v. Messer, 408 So.2d 1354 (La.1982). Thus, a guilty verdict will not be overturned on the basis of improper argument unless the court is firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict. State v. Taylor, supra; State v. Bates, 495 So.2d 1262 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 826 (1987).
The first motion for mistrial addressed what the defendant believed to be the prosecutor asking the jury to "send a message here ... [w]ipe out crime in a community in our city." The statement proceeding the defendant's motion for mistrial is as follows:
One bunch calls themselves the Crips and, one bunch calls themselves the Bloods. In this courtroom, we are going to call them the Drips and the Cruds, and they are going to have to live with it and they're going toI don't care if they don't like it. But when you convict this guy of first degree murder, they are going to get the message. And all of these other Drips and Cruds sitting -
The prosecutor used the word message several times before and after this section *687 of his closing argument. On the one hand, he referred to the message that the defendant attempted to give to the Crips by opening fire on the Johnson home. Then he asked the jury to send a message to the defendant and his gang members about actions and their consequences. It was not a message to the community to "take up arms" as the defendant suggested and argued in his motion for mistrial. See State v. Messer, supra. The trial court correctly ruled that a mistrial was not warranted; no reversible error is presented in this assignment of error.
The defendant also assigns error to a second motion for mistrial which was made and denied after the prosecutor made these remarks during the state's rebuttal argument:
We talked about having the integrity to accept the challenge of trying to find the truth, then having the courage to speak what the truth was. And, once you find the truth in this case, you will then have the duty to convict this Defendant of first degree murder. There's simply no way around that. Because, as we said before, sometimes the hardest thing to do is what is right. The right thing is not to convict this guy of manslaughter or second degree murder and certainly not to acquit him. The right thing to do is to convict him on the evidence, that still stands unanswered, of first degree murder.
For the rest of your lives, justice will have a name, and for each of you justice will be Andre Brooks; because you are the only people that can hear his voice calling out to listen to this evidence. Have the integrity to search for the truth -
At that point, the defendant made another motion for mistrial on the basis of sympathy and passion. The trial court denied the motion; it did not find that the prosecutor's words would appeal to the jury's sympathy and prevent the defendant from receiving a fair trial and verdict.
The evidence of the defendant's guilt presented to this jury was substantial. Several witnesses testified that the defendant was wearing a white Kansas City Chiefs jacket on the night of the shootings; the defendant himself admitted as much in his police statement which was admitted into evidence. The jurors heard Degetrion Scott testify that he looked out of the window and saw a shooter wearing a white Kansas City Chiefs jacket. They also heard China Doll Johnson testify that the defendant was with Tyrone Pickrom when he got the loaded gun from his house and headed down Braebrook toward the Johnson residence. Both Steven Flakes and Carl Chambers testified before the jury about the defendant's admissions to them that he had been involved in the shootings. The jurors learned that the defendant disappeared from the neighborhood immediately after the shooting and tried to dispose of the white jacket, attempting to give it back to its rightful owner by hiding it in the back seat of her car. It is clear that the jury had abundant evidence to convict the defendant and that the statements made by the prosecutor in closing argument did not contribute to the verdict.
This assignment is without merit.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] At trial, Chambers sought to retract his statement to the police, claiming that he had been intimidated by a female police detective and that he felt that he had no choice but to tell them that the defendant had been involved in the shooting in order to avoid arrest.
[2] When Andre's body was delivered to the morgue, a bullet fell from his jacket hood that was later determined to have been fired from a 7.62 mm assault rifle and to be a unique type of foreign military target ammunition.
[3] Tyrone Pickrom was also arrested and initially charged with first degree murder. He was tried on a reduced charge of second degree murder in a separate trial in April 1997. He was convicted of manslaughter and sentenced to 30 years as a habitual offender. When placed under oath to testify at the defendant's trial, Pickrom invoked the Fifth Amendment in response to questioning by the defendant's attorney. In an opinion also issued today, this court affirmed his conviction and sentence. State v. Pickrom, 31,987 (La. App.2d Cir.5/5/99), 732 So.2d 800.
[4] Although it was impermissible to do so under the law in effect at the time of the present offense, La. Const. art. 1, § 16, and La.C.Cr.P. art. 905.2(B) now require that the jury in a capital case be informed of the governor's powers of pardon and commutation of sentence.