752 So.2d 255 (2000)
STATE of Louisiana
v.
Edward O. SCOTT.
No. 99-KA-0241.
Court of Appeal of Louisiana, Fourth Circuit.
January 5, 2000.
*256 Harry F. Connick, District Attorney, Parish of Orleans, John Jerry Glas, Assistant District Attorney, Parish of Orleans, New Orleans, Louisiana, Counsel for Plaintiff/Appellee.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, Counsel for Defendant/Appellant.
(Court composed of Judge WILLIAM H. BYRNES, III, Judge CHARLES R. JONES, Judge DENNIS R. BAGNERIS, Sr.)
BAGNERIS, Judge.
Edward O. Scott was charged by bill of indictment on March 6, 1997, with second-degree murder, a violation of La. R.S. 14:30.1. At his arraignment on March 11, 1997, he pled not guilty. A sanity commission was appointed on May 28, 1998, and on June 2, 1998, the commission reported that it found Scott competent to understand the charges against him; to assist his attorney; and to participate in his defense. Also on June 2nd, Scott waived his right to a trial by jury and elected a bench trial. After trial that same day, he was found to be guilty as charged. He was sentenced on July 17, 1998, to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
At trial Mary Deatrice Miller testified that she is married to Anthony Donaldson, and they have four children between the ages of five and eleven. They were living in a shotgun house at 8525 Hickory in January of 1997. On January 9th at about 6 p.m., Ms. Miller and her husband were in the kitchen, the back room in their fourroom house, and the children were in the living room, the front room of the house, when they all heard six or seven gunshots. Ms. Miller thought nothing of it because gunshots are not unusual in that neighborhood. However, when Shaquanta, the eleven-year-old daughter, came into the kitchen, she told her parents that she and her brother had been injured. Ms. Miller could see smoke coming from her leg. Ms. Miller said that Justin, her five-year-old son, had been shot in the eye and killed. Ms. Miller took the three children and ran to a neighbor's house where she called the police. Ms. Miller did not see the person who did the shooting.
Shaquanta Miller testified that she, her sister, and their brothers were watching television and eating in the living room when the gunshots began. She was sitting on the sofa and Justin was on the floor. After she was shot, she went to the back to tell her mother. Both her mother and father were in the kitchen.
Anthony Donaldson testified that on January 9th at about 5 p.m., he went across the street from his house to the Hickory Food Store to get money that the storeowner owed him. When Donaldson left the store, he met Scott, the defendant, who said, "Don't you owe me some money?" Donaldson replied, "I don't owe you no mother fucking money. I don't even know you. Get out of my face." Scott subsequently hit Donaldson in the chin, and Donaldson pushed Scott against his car. Because of the way that Scott was reaching into the pocket of his jacket, Donaldson thought he had a pistol in his jacket. However, when Donaldson told Scott to "go ahead and pull it out," Scott did not do so. Donaldson testified that he never saw a gun during the incident. Scott got into his car and drove away. Donaldson walked home and went into the kitchen to talk with his wife. He heard gunshots, but he was not alarmed until his daughter came into the room screaming. He ran to the living room to find his son on the floor with a gunshot wound to the head. Donaldson ran out the front door and saw Scott running away. Donaldson thought Scott had run into a nearby barroom, and *257 Donaldson went there to find him. Scott was not there. Donaldson told a police officer that he knew the gunman by sight but not by name. When he went to the police station and was shown a photographic line-up, Donaldson selected Scott's picture. Donaldson emphatically denied owning or possessing a gun. He admitted to having a prior conviction for possession of stolen goods in 1985 or 1986. Donaldson testified that he also pled guilty to aggravated battery shortly after his son was shot.[1]
Dr. Monroe Samuels, an expert in the field of forensic pathology, testified that he reviewed the autopsy report on Justin Miller (Dr. De Fatta performed the autopsy, but he was unavailable.). Dr. Samuels said that a bullet entered Justin's left eye, moved across the base of the skull, and exited above the right ear. The child was dead when he arrived at the hospital.
Officer Heather Kouts testified that she met the ambulance taking Justin and Shaquanta Miller to the Medical Center of Louisiana. She stayed with Shaquanta while the child was being x-rayed. Officer Kouts said that Shaquanta kept asking about her brother. Later, at the police station, Officer Kouts tried to get a statement from Donaldson, but he was too agitated to sit down and talk.
Detective Steven William, the lead investigator in the case, testified that when he arrived at the house on Hickory Street at about 6:30 p.m., he noticed four bullet holes in the front door and one hole on the door trim on the left side. Upon entering the front room, he saw blood on the floor; a bullet hole on the right side of the sofa that went all the way through the sofa; and a plate of food pierced by a bullet. In the second room he found the bullet that had gone through the sofa. In the third room he saw two bullet holes in the wall and a spent pellet on a lower bunk bed. After his examination of the house, the detective met several officers at 1424 Dante Street, where Scott's mother lived. Mrs. Scott informed the officers that her son was talking with her on the telephone at the time. She gave Detective William permission to listen in on the telephone while she spoke to her son. Mrs. Scott pleaded with her son" to do the right thing," and Scott answered in a "low" and "troubled" voice, saying that he would shoot any police officer that came near him and that he was going to harm himself. The detective learned that Scott was at 2422 Columbus Street, and several officers were sent to that address. Later, Detective William, accompanied by two other officers, went to the Second District Police Station where Scott had been taken and then drove Scott to Central Lockup. While en route, Scott asked if the detectives wanted to go by the house of the man who gave him the gun. Scott then directed William to 1730 General Ogden Street and said that "Willy" was not at home because his blue car was not parked there. Scott next asked if he could show the officers where he was standing when he shot through the front door of the Hickory Street house. Although Scott was not allowed to leave the car, he pointed out where he stood while shooting. Detective William testified that Scott volunteered all of this information.
Detective Jerome Laviolette testified that he went to the Hickory Street house with Detective William. Detective Laviolette spoke to several people in the neighborhood and received information that enabled him to compile a photographic lineup containing Scott's picture, which he showed to Donaldson. Detective Laviolette testified that Donaldson selected Scott's picture. Detective Laviolette was in the car when Scott volunteered to show where the man who gave him the gun *258 lived, as well as where he stood while shooting at the Hickory Street house.
There were two stipulations during the trial. First, that if Elizabeth Little of the crime lab testified, she would state that five bullet casings and four bullets were recovered from the Hickory Street house. Second, that if Officer@ Kenny Leary, an expert in firearm examination, were to testify, he would state that three of the bullets found in the house came from the same gun; the fourth bullet was unsuitable for comparison. Officer Leary would also state that the same weapon fired the three fired cartridge casings that were found in the street.
Detective Arthur Kaufman testified that he went to the Columbus Street address to arrest Scott. As soon as the detective entered the house, Scott stated, "I'm the person you're looking for." Scott was handcuffed and advised of his rights. Once at the police station, Scott gave a statement and signed it. When asked if Scott gave any reason for the shooting, Detective Kaufman answered:
He indicated that the victim's father had shot him previously. He was scared of him. And he indicated on the day of the incident that the victim's father had a shotgun and walked out of the residence when he was in front of the residence and out of fear he shot back.
Officer Jimmy Slack testified that he made an aggravated battery report in November of 1996 about Edward Scott's being shot in the leg. Officer Slack found Scott crawling in a driveway between two abandoned houses. Scott refused to make any statement to the police about what happened.
Detective Louis Gaydosh did the follow-up investigation on the aggravated battery case involving Edward Scott. Detective Gaydosh identified the date on which the incident occurred as November 13th. He made eight telephone calls to Scott and also left messages with Eva Scott. Detective Gaydosh further testified that in December of 1996, a man called him and identified himself as Edward Scott. Scott told Detective Gaydosh that he had no reason to come to the station to talk.
In a single assignment of error, Scott contends that the State failed to produce sufficient evidence to support his conviction for second-degree murder. Scott maintains that the evidence was insufficient to prove he had specific intent to kill or to inflict great bodily harm.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. See La. R.S. 15:438. La. R.S. 15:438 is not a separate test from Jackson v. Virginia but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La. 1987).
La. R.S. 14:30.1 defines second degree murder as "the killing of a human being. ....when the offender has a specific intent to kill or to inflict great bodily harm." Specific criminal intent is defined as "that state of mind which exists when *259 the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532.
Scott argues that this case is similar to State v. Whins, 96-0699 (La.App. 4th Cir. 4/9/97), 692 So.2d 1350, writ denied, 97-1227 (La.11/7/97), 703 So.2d 1263, where this Court affirmed the trial court's granting of a post-verdict judgment of acquittal on the grounds that there was insufficient evidence of specific intent to kill in a case where the defendant was charged with one count of attempted second degree murder and three counts of manslaughter. In Whins the defendant was seen approaching his ex-girlfriend's trailer with a shotgun. The ex-girlfriend, her father and two young children were inside the trailer when the defendant began screaming for her to come outside. While her father held the front door closed, the ex-girlfriend ushered the children into a bedroom. Meanwhile, the defendant shot at the doorknob (not the door itself) in trying to force his way into the trailer. The father, Mr. Ragas, held the door shut, and the defendant then shot out a window of the living room and of the kitchen and climbed into the trailer through one of the shot-out windows. (The bullets hit a ceiling fan and a ceiling fixture.). Mr. Ragas then fought with the defendant and tried to get the gun away from him. However, Mr. Ragas was not successful and finally ran into a bedroom. The defendant had threatened to shoot Mr. Ragas, but he did not. The defendant then ordered his ex-girlfriend out of the bedroom. He held a gun to her head and threatened to shoot her but did not. When Whins was apprehended immediately after he left the trailer, his gun was empty. No additional ammunition was found on him; moreover, his gun had to be loaded prior to each shot. Therefore, he could not have thought that his gun would fire, and, as a result, he could not have had the requisite intent to kill.
The instant case can be distinguished from Whins because in the case at bar, Scott shot at least four times through a door into a living room where a television was playing. He did not aim upward so that the bullets hit the ceiling; he aimed straight through the shotgun house so that bullets were found in the first, second, and third rooms. His shots hit two people and also went through a sofa and a dinner plate, and one landed on a bunk bed. Scott was obviously intent upon killing or grievously injuring an inhabitant or all the inhabitants of this home. This case is similar to State v. Smith, 31,955 (La.App. 2nd Cir. 5/5/99), 740 So.2d 675; there, the defendant and several other members of a gang drove by the Johnson house, where members of a rival gang were standing in the front yard. Members of the rival gang shot at the car in which the defendant was riding. Later the defendant and another gang member went to the Johnson house; the car that had been parked in front of the house was gone, but lights were on in the house. The defendant shot into the front room where seven children were watching television. One of the children was killed. The defendant, convicted of first-degree murder, argued there was insufficient evidence of specific intent. However, the Second Circuit found that the circumstances of the crime and the acts of the defendant clearly indicated the defendant had specific intent. The defendant knew the car belonging to the rival gang member was gone, and he told the police that he knew children lived in the house. He saw no one in the front yard and a light on in the living room. The Second Circuit held that specific intent was established by the defendant's "taking a loaded assault rifle and shooting it multiple times into a house full of children." State v. Smith, 31,955, p. 6 (La.App. 2nd Cir. 5/5/99), 740 So.2d 675.
*260 In this case, Scott admitted standing in front of Anthony Donaldson's house and firing multiple times at the door. Although he did not say he knew that children were in the house, lights were on in the house and the television was playing in the front room. Four bullet holes were found in the front door, and the bullets hit the furniture in the room as well as two of the children. Unlike the defendant in Whins, Scott did not aim at the ceiling of the house. Like the defendant in Smith, Scott's specific intent became "transferred intent". The trial judge explained:
[w]hen a person commits an act, having a specific intent to kill or inflict great bodily harm upon a certain person by the act, but instead kills another person by mistake or inadvertence, the law nonetheless holds him responsible for the death of that other person, and further holds that it is just as if the person had.... originally intended to kill or inflict great bodily harm upon the person actually killed.
In his reasons for judgment, the trial court judge considered the defense argument that the victim's father was not in the kitchen with his wife but was in front of the house with a gun. The judge stated:
Even if I was [sic] to discount Mr. Donaldson's testimony, if I was [sic] to disregard it entirely and I would also discount the testimony of Mary Miller, I guess, with the suggestion that Mr. Donaldson would have influenced her testimony in some way, and he shouldn't be trusted, so she shouldn't be trusted, I'm still left with the testimony of Shaquanta Miller. And since she had to sit next to her little brother when his head was blown off, I really don't believe that she would have come up here and lied to the court.
The trial court found clear evidence of the defendant's specific intent to kill or inflict severe bodily harm based on the fact that, after having scuffled with Donaldson earlier that evening, Scott shot at least four times into a room of Donaldson's house where the light and noise of the television playing would indicate that people were present.
There is no merit in this assignment of error.
Accordingly, for reasons given above, Scott's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The aggravated battery charge had nothing to do with the battery of the defendant that two officers testified to in this case. Donaldson said that he needed money to move his family, and someone who owed would not pay, and Donaldson got into a fight with the man.