BROWN, Chief Judge.
_JjDefendant, Bryant Jones, convicted of attempted first degree murder for wounding five people by shooting into a crowd that was leaving a party at the Teen Center in Oak Grove, Louisiana, and sentenced to 25 years at hard labor without benefit of parole, has appealed his conviction. His only assignment of error is that the evidence was not sufficient to sustain the conviction. We affirm.

Discussion

The decision of the U.S. Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), expanded appellate review of facts in state court criminal cases. Jackson held that to meet due process guarantees criminal convictions must be based on a reasonable doubt standard. The Jackson court held that the proper test for a reviewing court in determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. On appeal, a reviewing court must view the evidence in the light most favorable to the state. As stated in Jackson, “[Ujnder the standard established in this opinion as necessary to preserve the due process protection recognized in Winship, a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.” Jackson v. Virginia, 443 U.S. at 326, 99 S.Ct. at 2793. The Jackson reasonable doubt standard is now the only standard of review of facts for Louisiana appellate courts. La. \9C. Cr. P. art. 821; State v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 86 (Lemmon, J, concurring).
Defendant was charged with attempted first degree murder. The fundamental elements of the crime of attempted murder or manslaughter are a specific intent to commit murder/manslaughter, that is, to kill, and an overt act in furtherance of that objective. State v. Hutcherson, 34,540 (La.App.2d Cir.4/4/01), 785 So.2d 140. As applicable in this case, to convict of attempted first degree murder, the State must prove that defendant possessed the specific intent to kill more than one person and committed an overt act toward that goal. State v. Maten, 04-1718 (La. App. 1st Cir.03/24/05), 899 So.2d 711, writ *952 denied, 05-1570 (La.01/27/06), 922 So.2d 544.
On June 9, 2007, Latisha Freemen had a 22nd birthday party at the Teen Center in Oak Grove, Louisiana. She had a disc jockey and an “all you can drink open bar” for a three dollar cover charge. The 19-year-old defendant was at the party which had a crowd in and out ranging from 25 to 100 people. Shortly after 1:00 a.m. a fight broke out. Defendant interceded by showing a gun in his waistband and telling the participants in the fight and gathering crowd to “chill out.” Latisha Freeman grabbed the D.J.’s microphone and told everyone that defendant had a gun and to leave. Defendant left with his first cousin, Reginald Turner. Reginald got a gun from his car and both began to fire their guns indiscriminately at the people Inleaving by the front door.[1] The building is on a slab at ground level and the two shooters were in front of the building firing at close range.
Defendant did not testify; however, what occurred inside the Teen Center is not disputed. There is conflicting testimony as to whether defendant waved the gun about or just showed it. Defendant concedes in brief that he showed a gun inside the center and told the combatants to “chill out.” In brief, defense counsel stated the following:
When defendant got outside, he thought someone was firing at him. There was a man in a white T-shirt who was shooting wildly. Reginald Turner (defendant’s cousin) had gone to his car and got a large handgun and started shooting rounds at a rapid rate. Another individual in a black shirt was firing a gun. It was complete confusion and everyone involved was deprived of his or her self control and cool reflection.
[[Image here]]
... He (defendant) did not know if a large group was about to attack him. He did not have time to figure out if the people rushing out of the party were coming at him. He did not know if the person shooting in the air was shooting at him.
This is simply argument of counsel and appears to be claiming self defense (although this is not specifically argued); however, defense counsel does strongly argue that the verdict should have been attempted manslaughter.
Officer Charles Allen Irby, an investigator with the Oak Grove Police Department, testified to finding 20 casings and live rounds at the scene outside of the Teen Center. At least six bullets struck the front of the Teen Center. The indentations left by the bullets indicated that the shots had been fired from outside of the building.
|4Using a diagram of the crime scene, Officer Irby marked the areas where bullet casings and live rounds were found. The majority of the casings were .380 caliber and found near a tree and a picnic table to the right of the front door (looking at the building). To the left of the door, nine 9 mm shell casings were found as well as one .40 caliber spent shell casing.
Witnesses identified defendant and Reginald Turner as parties who possessed and fired weapons that night. Officer Irby testified that he believed others may have been shooting as well; however, no other shooters were identified by the police.
On the night of the shooting, Reginald Turner, the other person arrested in this case, was stopped by police, and the vehicle he was driving was searched. No *953 weapons were found. Several days after the shooting, the defendant voluntarily turned himself in. No weapon was recovered from defendant.
Officer Irby testified to four people being shot in the incident at or near the front entrance of the building.[2] No “slugs” were recovered after they were removed from either the victims or from the immediate scene of the shooting. Thus, he was unable to identify a particular caliber weapon that may have caused the injuries.
Several people testified about the fight and defendant’s brandishing of a handgun inside the center. As stated, defendant does not deny the fight or that he showed a gun in his waistband.
| -.Several people testified to seeing defendant outside the Teen Center shooting at the people leaving the center. Latisha Freeman saw defendant standing outside, and someone in a black shirt standing next to him. Defendant was shooting a black gun that looked like the one he had inside of the center. The individual in the black shirt was also shooting.
Latisha testified that she was hit on the top of her left foot by a bullet and that she moved back inside the building. She was transported to the hospital after the shooting. Ms. Freeman believed that defendant was trying to kill whoever walked out of the door of the center.
During cross-examination, Ms. Freeman testified that defendant was shooting directly at the door of the center while the person in the black shirt was “basically shooting everywhere.” Ms. Freeman stated she was aware that members of the Freeman family had problems with defendant’s family but she was unsure of the source of the contention, noting, “Well, they tell me it goes way back. I don’t really know.”
Nerrissa Freeman, Latisha’s third cousin, testified that she had known defendant since elementary school. She saw defendant with the gun inside the Center and believed it was either a .38 or a .45. Ner-rissa went to the door and saw defendant standing outside of the center shooting towards the door. She was certain that defendant and his cousin, co-defendant Reggie Turner, were firing their weapons multiple times because she could see “fire come from the guns.” Nerrissa testified that defendant and his co-defendant, Reggie Turner, were not the only people shooting that night; she saw a man dressed in a white shirt and light blue jeans shooting straight up pinto the air. As she ran back into the building, she was hit in the lip by an object that “popped” off of the building. She recalled hearing 40 to 50 shots, and she believed there were more than two weapons being fired, possibly as many as four or five. She was aware of the Freeman and Jones feud, and knew it involved her “boy cousins.” During cross-examination, she testified she had approximately six to seven drinks of Crown Royal, straight. Nerrissa testified that drinking had not altered her thinking and she was not drunk, but “crunk,” meaning ready to party.
Shakia “Honey” Freeman testified that following the incident inside the Center, she went out the front door and was shot twice, once in her hip and once in her knee. Anthony Craft and Gawun Jordan bent down to help her up and they moved her to the side of the building heading toward Jordan’s car. While attempting to get to his car, Jordan was also shot. Honey was unable to identify who was doing the shooting.
Gawun Jordan testified it was about 1:00 a.m. when he arrived at the party alone. *954 Jordan testified he was in the last group of people trying to get out of the building and as he got outside, he heard gunshots. Honey got shot and fell down almost immediately after leaving the building. Jordan testified that he felt a burning sensation in his leg. At that point, Jordan put Honey into his cousin’s car and they went to the hospital. Jordan testified there were “a whole bunch of [shots being fired].” The witness believed there were different guns being fired because he heard different sounds as the shots were being fired. Jordan did not see anyone shooting that night, |7nor was he able to tell where the shooter might have been located. Jordan believed he and Honey would be killed outside the center.
At the hospital Jordan realized that he had in fact been hit by a bullet in his left knee. The bullet fragment hit him on the inside of his left leg and was not removed because doctors believed removal would cause more damage than leaving the fragment undisturbed.
Elaine “Kandi” Freeman, Latisha Freeman’s sister, testified that she saw the incident inside the center and rushed with the crowd toward the door. She saw defendant standing with Reggie Turner outside of the building near a tree. Kandi did not see Reggie Turner shoot, but she did see defendant shooting towards the door of the Teen Center.
Tyrone Johnson testified that he had been at the party and inside the Center. He saw defendant exposing or “flashing” the gun, but not pulling it out. Johnson stated that defendant left the building with “Reggie and a couple more guys.” Johnson followed defendant and his group outside of the building. Once they got outside, Reggie went to a white truck and retrieved a weapon. Johnson was not sure what kind of weapon it was, but he saw that it required two hands to hold. Defendant was also holding a black handgun. Johnson testified that he was standing behind some cars off to the side in an area between defendant and the door of the center. From his location, Johnson could see both defendant and Reggie firing their weapons numerous times towards the front door of the Teen Center where people were still leaving the building. Johnson believed he only heard two guns being fired during the time he was on the ground.
[¡¡David Wayne Carroll testified that he was at the party and saw a fight going on inside of the building. After the fight, the party was over and the lights were turned on as the crowd rushed for the door. Carroll stated that he was one of the last people to leave the building. Carroll knew defendant well as he was best friends with defendant’s brother, Mario. In fact, prior to the party, defendant and Carroll had gone riding around together. Carroll was shot in his left shoulder, left leg, right leg and right knee. Carroll stated that he was hit in the right knee three times and that the bullets broke his tibia: All the bullets were recovered from his body except one that remained in his right leg. As a result of the shooting, Carroll was unable to continue his long haul trucking job and was left disabled. Carroll did not see anyone firing a weapon that night, and he did not know who shot him.
Shuntae La’Rae “Dottie” Turner attended the party. After the fight, Dottie left the building and saw Reggie (her first cousin) and his brother, Jamie Turner, walking over to the vehicles. Next, someone said, “get down they are shooting in the air.” Dottie looked in that direction and saw Reggie shooting toward the doors of the building directly at the crowd. Dot-tie did not see defendant shooting. She heard gunfire from more than one direction and out front. There was another *955 shooter wearing a white t-shirt who was firing in the air.
After the state rested its case, the defense recalled Officer Allen Irby to state what some of the state witnesses told or didn’t tell him in his investigation. Defendant did not testify, and the defense presented no other witnesses.
|flA review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the defendant guilty beyond a reasonable doubt of attempted first-degree murder. Under the evidence presented, there was no question that defendant indiscriminately shot into a crowd of people leaving the building. The crucial factual dispute went to the sufficiency of the evidence to support a finding that he specifically intended to kill. This question must be gauged in the light of applicable our law concerning specific intent. Under that law it is well settled that such intent need not exist for any particular length of time, and that an intent to kill may be formed at the moment of the commission of the unlawful act. State v. Harris, 01-2730 (La.01/19/05), 892 So.2d 1238, cert. denied, Harris v. Louisiana, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005). From both the direct and circumstantial evidence in the record, it is clear that a rational juror could reasonably have found that defendant, who fired numerous rounds into a crowd of people leaving a party, did possess an intent to kill more than one person. Defendant and his cousin fired at close, and thus predictably fatal, range.
A claim of self-defense would have required the jury to draw a series of improbable inferences from the basic facts. In particular, it would have required the jury to believe that the crowd rushing from the building was armed and coming after defendant. It is evident from the record that the jury rejected this scenario.
Under the standard established in Jackson as necessary to preserve the due process protection a reviewing court faced with a record of [^historical facts that supports conflicting inferences must presume that the factfinder resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Applying these criteria, we hold that a rational trier of fact could reasonably have found that defendant committed attempted murder in the first degree. The jury was not obligated to return a verdict of attempted manslaughter when the evidence presented supported the attempted first degree murder finding.
Defendant’s conviction and sentence are affirmed.
APPLICATION FOR REHEARING
Before BROWN, STEWART, GASKINS, CARAWAY and LOLLEY, JJ.
Rehearing denied.

. At the time of trial, attempted first degree murder and possession of a firearm by a convicted felon charges were pending against Turner.

. A fifth victim was struck on the lip by a fragment.