# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 24-493

**STATE OF LOUISIANA**

**VERSUS**

**JALEN LEVINE**
**A/K/A JALEN JUWAN LEVINE**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 62835
HONORABLE THOMAS J. FREDERICK, DISTRICT JUDGE

**********

**GARY J. ORTEGO**
**JUDGE**

**********

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.

**AFFIRMED.**

**Donald Dale Landry**
**District Attorney**
**15th Judicial District Court**
**Celeste C. White**
**Assistant district Attorney**
**P. O. Box 3306**
**Lafayette, LA. 70502**
**(337) 232-5170**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **State of Louisiana**

**Edward Kelly Bauman**
**LA Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA.  70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Jalen Levine**
     **A/K/A Jalen Juwan Levine**

**ORTEGO, Judge**.

Defendant, Jalen Levine, a/k/a Jalen Juwan Levine, appeals his convictions of one count of first degree murder, in violation of La.R.S. 14:30; one count of attempted first degree murder, in violation of La.R.S. 14:27 and La.R.S. 14:30, and his resulting sentences. For the following reasons, we affirm Defendant's convictions and sentences.

## PROCEDURAL HISTORY

On March 5, 2018, Defendant, Jalen Levine, was charged by an indictment with one count of first degree murder, in violation of La.R.S. 14:30; and one count of attempted first degree murder, in violation of La.R.S. 14:27 and La.R.S. 14:30. Defendant pled not guilty.

On August 10, 2023, Defendant was found guilty on all counts by a unanimous jury. On March 18, 2024, Defendant was sentenced to life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence for count one of first degree murder; and twenty-five years at hard labor, without benefit of probation, parole, or suspension of sentence for count two of attempted first degree murder. Both sentences are to run concurrently. Defendant filed a Notice of Intent to Appeal with the trial court on April 19, 2024, which was granted the same day.

The Defendant now appeals, asserting two assignments of error. First, Defendant argues the State presented insufficient evidence to prove beyond a reasonable doubt that Defendant was guilty of first degree murder and attempted first degree murder. Second, the trial court erred in denying his motion for new trial and motion for post-verdict judgement of acquittal.

## FACTS

Around 7:30 pm on December 19, 2017, Lieutenant Jonathan Touchet of the Abbeville Police Department was dispatched to the intersection of Schlessinger Street and Vernon Street after receiving reports of shots fired. Looking onto Vernon Street, Lieutenant Touchet noticed someone lying in the road and someone else waving his arms at him. The person on the road, the victim, Dylan Plowden, ("Dylan"), was bleeding profusely from the front of his shirt. Dylan informed his grandfather, Gary Hoffpauir, and police that "Gutta" shot him. Police later discovered that another juvenile, J.K., was with Dylan when he was shot.[1] Pictures taken at the autopsy indicated that Dylan had been shot three times, once on his chest, once on the back of his hip, and once on the back of one of his legs. The bullet recovered from his body appeared to be consistent with that of a .17 caliber round. Dylan was fourteen years old.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error in the minutes of sentencing and one error in the Uniform Commitment Order. Additionally, there is one other issue worth noting, although not an errors patent.

Both the minutes of sentencing and the Uniform Sentencing Commitment Order (USCO) require correction. According to the minutes of sentencing, the trial court ordered the sentences to run concurrently with each other and with any other sentence Defendant was then serving. The USCO states the trial court ordered the

---

[1] J.K. was sixteen years old at the time of the shooting and is currently alive. In accordance with La. R.S. 46:1844(W), he is referred to by his initials.

sentences to run concurrently with "any or every sentence the offender is now serving." According to the transcript, however, the trial court ordered the sentences to "run concurrent with each other" without any mention of any other sentence Defendant may be serving. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Thus, we order the trial court to amend the minutes of sentencing to accurately reflect the trial court's instruction that states only these sentences to "run concurrent with each other."

As for the issue worth noting, and although the minutes do not state anything regarding the polling of the jurors, the transcript indicates that defense counsel requested polling of the jury. The trial court then orally asked each juror, "[I]s that your verdict[,]" and each juror responded affirmatively, thereby confirming a unanimous jury verdict.

Since polling was requested, La.Code Crim.P. art. 812 seems to require that the polling be conducted in writing, not orally as was done in this case.

In *State v. Rickmon*, 23-48 (La.App. 4 Cir. 8/30/23), 372 So.3d 60, *writ denied*, 23-1311 (La. 5/21/24), 385 So.3d 241, the fourth circuit addressed this issue as an assigned error. Having been found guilty of two counts, Rickmon claimed the written polling was unclear since there was "no specification as to which count the jurors were being polled on." *Rickmon*, 372 So.3d at 70. The polling slips in *Rickmon* did not require the jurors to answer yes or no as to the jury's verdict on each count. *Id.* The fourth circuit stated the following:

> At the outset, we note that our law does not require jury polling in criminal cases, although it allows both the defense and the State to request that the jury be polled. *See* La. C.Cr.P. art. 812.

3

In the case *sub judice*, the jury was polled, and the record reflects the unanimity of the jury's verdicts. After both verdicts were read, the judge directed the clerk to poll the jury in writing. Each juror was provided a polling slip which asked, "Is this your verdict?" After the jurors completed the polling slips, the clerk collected the slips and then read aloud the name and response given by each individual juror. Each juror responded either "yes" or "guilty." Upon completion of the polling process, the judge certified the verdicts as legal.

There was no request for individualized polling on each count. Further, there was no objection to the polling procedure utilized by the district court. As Defendant failed to make a contemporaneous objection to the polling procedure, he cannot raise this issue for the first time on appeal. *See* La. C.Cr.P. art. 841(A); *State v. Bernard*, 02-1644, p. 7 (La. App. 4 Cir. 4/2/03), 844 So.2d 1001, 1005; *State v. Amato*, 96-0606, p. 23 (La. App. 1 Cir. 6/30/97), 698 So.2d 972, 988; *State v. Alexander*, 21-1346, p. 24 (La. App. 1 Cir. 7/13/22), 344 So.3d 705, 724.

Defendant argues that the alleged error in the polling procedure is an error patent, and, as such, an objection to the procedure utilized to poll the jury was not required. Defendant cites *State v. Norman*, 20-00109 (La. 7/2/20), 297 So.3d 738, and *State v. Robinson*, 21-0254 (La. App. 4 Cir. 2/18/22), 336 So.3d 567, *writ denied*, 22-00437 (La. 5/24/22), 338 So.3d 1185, in support of his argument.

In *Norman*, the record showed that the district court ceased polling the jurors after the first ten jurors. 20-00109, p. 1, 297 So.3d at 738–39. Hence, it was not known whether the verdict was unanimous. The Supreme Court remanded the matter to the district court "to conduct further proceedings to ascertain whether the verdict was unanimous" and to "provide a *per curiam* . . . within ten days of ruling on the *Ramos* issue and stating the outcome." 20-00109, p. 1, 297 So.3d at 739. Similarly, in *Robinson*, the record was devoid of jury polling slips or any other indication of the verdict's unanimity. 21-0254, p. 33, 336 So.3d at 586. Thus, pursuant to *Norman*, this Court remanded the matter to the district court to "clarify[ ] the record on the crucial issue of whether the jury's verdicts were unanimous." *Id.*

This Court had occasion to apply *Norman* and *Robinson* in *State v. Lamizana*, 21-0409 (La. App. 4 Cir. 3/23/22), 366 So.3d 416. In *Lamizana*, the record showed that polling was not requested; therefore, the jury was not polled. 21-0409, p. 7, 366 So.3d at 421. Pursuant to *Norman* and *Robinson*, the Court remanded the matter to the district court "to clarify the record on the crucial issue of whether the jury's verdicts were unanimous." 21-0409, p. 8, 366 So.3d at 421.

*Norman*, *Robinson*, and *Lamizana* are easily distinguished from the case *sub judice*. Here, the jury was polled, and the record reflects the unanimity of the jury's verdicts. We find no merit in Defendant's argument.

*Id.* at 71–72 (alterations in original) (footnote omitted).

The first circuit reached a similar conclusion in *State v. Alexander*, 21-1346, p. 24 (La.App. 1 Cir. 7/13/22), 344 So.3d 705, 724, *writ denied*, 22-1262 (La. 11/8/23), 373 So.3d 62:

> In pro se assignment of error number two, the defendant notes that no written jury poll was conducted in this matter and argues that the oral polling was unclear, as there was no specification as to which count the jurors were being polled on. The defendant notes that the polling did not request each member of the jury to answer yes or no as to the verdict on each count. The defendant argues that where the transcript does not resolve the conflict, the convictions should be reversed.
>
> At the outset we note that our law does not require jury polling in criminal cases, although it allows both the defense and the State to request that the jury be polled. See La. C.Cr.P. art. 812. Herein, after both verdicts were read in this case, the defense attorney asked that the jury be polled. Based on the trial transcript, the jury unanimously confirmed that the verdicts were correct. There was no request for individualized polling on each count. Further, there was no objection to the polling. As the defendant failed to make a contemporaneous objection to the polling procedure, he cannot raise this issue for the first time on appeal. See La. C.Cr.P. art. 841(A); **State v. Amato,** 96-0606 (La. App. 1 Cir. 6/30/97), 698 So.2d 972, 988, writs denied, 97-2626, 97-2644 (La. 2/20/98), 709 So.2d 772. Further, based on our review of the record, there is no indication that the jury's verdicts were improper. We find no merit in pro se assignment of error number two.

Likewise, we do not find this to be an errors patent issue in the present case. Here, the jury was instructed that its verdict must be unanimous. At defense counsel's request, the trial court orally polled the jury to confirm the verdict was unanimous, and neither party objected to the manner of the polling.

## ASSIGNMENTS OF ERROR

The Defendant lists his assignments of error as follows:

1. The evidence presented at trial, when viewed in a light most favorable to the prosecution, was insufficient to convict Mr. Levine guilty of the crimes charged beyond a reasonable double.

2. The trial court erred in denying Mr. Levine's motion for a new trial and motion of acquittal.

5

# ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, Defendant contends the evidence presented was insufficient to prove beyond a reasonable doubt that he was guilty of first degree murder and attempted first degree murder. Given this first assigned error, we will look at a summary of the evidence presented at trial.

### *Evidence Presented at Trial*

Ten witnesses testified at trial, including: Gary Hoffpauir (maternal grandfather of Dylan Plowden) ("Mr. Hoffpauir"); Lieutenant Jonathan Touchet (former Abbeville Police Department, first unit on scene) ("Lieutenant Touchet"); Officer Elliot Leleaux (former Abbeville Police Department, patrol officer) ("Officer Leleaux"); Officer Trent Guidry (former Abbeville Police Department, detective sergeant) ("Officer Guidry"); Captain Ryan Boutte (former Abbeville Police Department, lead investigator) ("Captain Boutte"); Officer Leland Lassiter (former Abbeville Police Department) ("Officer Lassiter"); Quintygi Richard (Defendant's girlfriend), ("Ms. Richard"); Patricia Levine (Defendant's mother), ("Ms. Levine"); J.K. (victim of the attempted murder); and Jacob Landry (prisoner) ("Mr. Landry").

The first witness to testify was Mr. Hoffpauir. He testified that he had a close relationship with Dylan, helped raise him, and saw him every day. Mr. Hoffpauir testified he was asleep on the night of the shooting when someone knocked on his door and told him that his grandson had been shot. He rushed to the scene and observed Dylan lying on his stomach, surrounded by officers. After asking bystanders in the growing crowd whether anyone had seen who had shot Dylan, he was eventually able to ask Dylan directly who shot him, to which Dylan mumbled out, "Gutta. Gutta, Paw Paw." He denied that Dylan said, "Gutta and them." Mr. Hoffpauir knew Defendant went by this nickname and positively

6

identified him in court. Mr. Hoffpauir was also somewhat familiar with J.K., whose relationship with Dylan he disapproved, but at the time of the murder he was unaware that J.K. and Dylan were together.

The second witness to testify was Lieutenant Jonathan Touchet, formerly of the Abbeville Police Department and first officer on scene. He testified that he heard Mr. Hoffpauir's exchange with Dylan and thought that he heard Dylan respond "Gutta," although his report from that day stated that Dylan's response was "Gutta and them."[2] Lieutenant Touchet also transported Dylan to Abbeville General Hospital and remained there with him for some time. Lieutenant Touchet testified that, at the request of detectives, he again asked Dylan who shot him, and this time captured his response on video camera, which was viewed by the jury. The body camera footage shows Dylan lying on the hospital bed, and Dylan was uncertain as to Gutta's real name when asked. When an officer asked, "Pig,[3] who shot you," he mumbled something that sounded like "Gutta-them." During this exchange, Dylan did not open his eyes, he mumbled his responses out, moaned, and exhibited other signs of extreme pain. Police did not ask Dylan any follow-up questions concerning the shooting.

Mr. Elliot Leleux, formerly a patrol officer with the Abbeville Police Department, testified he was tasked with gathering evidence on the scene shortly after the shooting using his flashlight, although he was unsuccessful in finding anything firearms related. What he did notice, and caught on police body camera, was a woman requesting to speak to an officer regarding the shooting. Officer

---

[2] In Lieutenant Touchet's notes regarding the interaction between Dylan and Mr. Hoffpauir following the shooting of Dylan, he wrote that Dylan said "Gutta and them" instead of just "Gutta." This seems to have been in error, as Lieutenant Touchet testified at trial that he also heard Dylan say "Gutta," rather than "Gutta and them."

[3] "Pig" was Dylan Plowden's nickname.

Leleux already knew this woman personally as "Peaches." The woman, who was subsequently identified as Defendant's mother, told officers that she "just got a call saying my son got shot."

Mr. Trent Guidry, formerly a detective sergeant with the Abbeville Police Department, testified he arrived later in the evening to take pictures of the area and any evidence that had been located. He was also called back to the scene the following morning to look for spent casings, during which he found handgun rounds, probably .40 caliber, on the sidewalk adjacent to the street. His daytime pictures were admitted as State exhibit two.

Next to testify was Captain Ryan Boutte with the Abbeville Police Department and lead investigator for this case. Captain Boutte testified that when he arrived at the scene in the evening, his attention was directed to a nearby tree in an area behind a tree line running parallel to Vernon Street, possibly right behind a wooden fence running towards Vernon Street, where police found ten casings. These casings turned out to be .17 caliber rifle rounds.[4] Captain Boutte testified that since casings tend to be found next to wherever the weapon was fired, police deduced that the shooter had fired from the bushes where the casings were found, which led police to suspect this was an ambush shooting. Police also recovered no relevant non-ballistic evidence other than Dylan's clothes, a hoverboard, and a bicycle. Police were confident at the time that Dylan was riding either the bike or the hoverboard but were unsure as to which one he was riding. Captain Boutte confirmed that he had told Lieutenant Touchet to ask Dylan again for further

---

[4] The State did not present a ballistics expert or a report that asserts what the caliber of these bullets, instead produced a picture showing what a .17 round bullet looks like in comparison to similarly sized and shaped rounds.

identifying information and that he did not prepare a photo lineup due to a lack of time prior to Dylan's passing.

Captain Boutte testified that almost immediately after the shooting he discovered that J.K. was at the scene with Dylan and he had J.K. brought in for questioning, with J.K's mother arrived shortly thereafter. In a video of the police interview with J.K. and his mother, which was admitted into evidence during J.K.'s testimony, J.K. admitted in the video that he was at the scene with Dylan, that he was the one on the hoverboard, and that Dylan rode the bike. In the video, J.K. described the shooter as dressed in black and that he was unable to identify the shooter. He also claimed that there was a second person with the shooter and mentioned seeing a handgun rather than a rifle, but J.K. noted that he saw the shooter standing in the road before the shooter then went off in the distance by the trees. J.K. claimed that while he tried to warn Dylan when the shooter was about to fire, Dylan couldn't hear him due to Dylan wearing headphones. When the shooting started, J.K. stated that he ran in a different direction than Dylan and hopped over a nearby fence.

J.K. denied any dispute between Defendant, himself, and Dylan, despite Captain Boutte's testimony to the contrary. However, J.K.'s mother told the police that she had heard of a potential feud involving the three, and she described how Defendant's mother called her to enquire about this shooting. J.K.'s mother also identified "Gutta" as referring to Defendant, saying, "Well, everybody knows one person named Gutta, and his name is [Defendant]."

Captain Boutte further testified that Defendant was arrested around the same time during a traffic stop in Lafayette. The car was being driven by Quintygi Richard, who was in a relationship with Defendant and was at the time of the

shooting pregnant with his child. Police found six or seven phones in her car, all but two of which were inoperable.

Captain Boutte testified that going into Defendant's interrogation, police were aware that a contact of his was named "Villain", so during the interview police started calling him by this nickname rather than "Gutta" to see if Defendant would correct them. When police eventually asked him directly "What's your nickname, Villain?" Defendant responded, "Gutta." In his original statement to police, Defendant insisted he was at Stonebridge Apartments during the shooting and did not admit to being anywhere near the scene or having any involvement in the shooting, self-defense or otherwise.

Nonetheless, Defendant did complain to officers how "he's everybody's scapegoat" and, when asked about Dylan, responded indirectly by complaining about "some young guys" shooting up his car and a wild group "doing a lot of criminal stuff." After Defendant repeatedly asked why he was being charged and how police got his name, he was informed that Dylan was the one who identified him as the shooter, which caused a significant shift in his demeanor.

Captain Boutte's testimony then returned to discussing the crime scene. First, he highlighted some skid marks from bullets hitting the road. The marks indicated that the projectiles traveled in a direction consistent with where the rifle casings were located. Based off these marks and other available evidence, police were able to map out approximately where the bullets would have impacted Dylan and where he eventually fell. Although this map was not submitted into evidence, Captain Boutte noted that the distance between where Dylan was shot and where he collapsed was not very far. Police also deduced that the bullet to Dylan's chest impacted him first when he was facing the shooter while the other two bullets would have impacted him while he was attempting to flee.

When asked what else he did at the scene, Captain Boutte noted that he interviewed some people sitting on a nearby porch on Schlessinger Street but did not follow up with them or get a recorded statement as they had only heard shots being fired and did not witness the shooting. He did not visit any of the other nearby residences for similar reasons. He expressed significant skepticism that any nearby cameras, especially on nearby apartment buildings, could have had any line of sight to the shooting. He did not remember personally canvasing the area to check for relevant video surveillance cameras, but he asserted that any failure to mention this search in reports would simply be an error and that searching for such cameras was a routine task that would have been done by either him or someone else in the department.

When questioned, Captain Boutte denied that there was any further information that could have been obtained from Dylan, particularly a photo lineup. He pointed out that a photo lineup requires a significant amount of time, a clear state of mind, and undivided attention, none of which Dylan was capable of giving by the time he was at Abbeville General. This was confirmed, as the body camera footage of Dylan in the hospital shows that he was only capable of mumbling out a couple of words at a time and that he was not opening his eyes prior to his passing.

We note that the only other witness who potentially observed the shooting, aside from J.K., was Keenan Greene ("Greene"). Although Greene could not be located for trial, his hearsay statements were referenced only during the defense's cross-examination of Captain Boutte. In his statement, Greene was reportedly able to identify Defendant by his real name and claimed that Defendant ran towards the nearby bush, grabbed a rifle that was lying there, and he fired this rifle at Dylan and J.K. from these bushes, thus confirming this was an ambush shooting. In his

statement, and although not confirmed, Greene also claimed that J.K. was the original aggressor and shot first using a handgun.

The next witness to testify was Leland Lassiter, formerly of the Abbeville Police Department. He arrived on the scene after Dylan was taken to Abbeville General, by which time the surrounding crowd had mostly dispersed. He described the various items that he and other police officers found on the scene that night, including Dylan's clothing, the hoverboard, the bike, a credit card on the other side of the street, and a blood stain on the ground. Although the name on this credit card was not specified, it was specifically noted that the credit card was located on the south side of Vernon Street away from the other objects and closer to a tree line. Pictures of these items taken that evening were then compared with pictures of the scene taken the next day.

As to the .40 caliber bullets, and although the daytime pictures show the .40 caliber handgun bullets, it is noted that these bullets are not visible in the nighttime pictures nor were they found by police that evening despite being within the one block search perimeter and their location being either directly within or at least directly adjacent to the frame of some of the nighttime pictures. Considering how silver .40 caliber handgun bullets sitting on a sidewalk should have easily reflected flashlights, police considered it implausible that they would have missed them if the bullets were actually there that night, particularly since, as Officer Lassiter noted, the framing of certain photographs suggests that the photographer would have had to stand more or less directly on top of the bullets. Accordingly, police gave the .40 caliber bullets little consideration as they were under the assumption that these rounds were somehow placed on the scene sometime between the night and daytime evidence sweeps by police. It was also noted that Abbeville Police

12

had not actually discovered the .17 caliber rounds the previous night, as it was the state troopers who uncovered them along the tree line.

Quintygi Richard testified that she was Defendant's girlfriend and was pregnant with his child at the time of the shooting. Her testimony was complicated because she testified that she "got fluid on her brain" sometime in the fifteen months prior to trial, which apparently affected her speech and memory. She confirmed that police retrieved a number of phones from her car after stopping her and arresting Defendant and that two of these phones belonged to her and Defendant. Defendant's name in her contacts was "Big Hoe."

The State also introduced into evidence text messages between Ms. Richard and Defendant on the night of the shooting indicating that he asked her to pick him up the night of the shooting around midnight from the Stonebridge apartment complex in Abbeville. Ms. Richard testified that Defendant's cousin lived at Stonebridge, and it was not unusual for Defendant to be in that area or for her to pick him up late at night. However, she testified on this particular evening that she was more hesitant to do so due to a fear about a "war coming into town" and the possibility of her car getting shot up. She testified this concern was not unwarranted, as her car had already been shot numerous times beforehand, including once while she was in the vehicle, and she believed that Dylan and J.K. shot up her vehicle on at least one of these occasions. Ms. Richard also confirmed that Defendant was in her car during one of these shootings.

Additionally, she initially testified that Defendant was "spooked" when he got into her car the night of the shooting because he was aware that the police were looking for him, which was confirmed with one of the texts of his to her claiming that he was spooked. Ms. Richard later recanted this portion of her testimony.

13

Last to testify for the State was Patricia Levine Thomas, Defendant's mother. Her testimony confirmed that she had talked to Officer Leleux the night of the murder. She also explained that she thought it was her son who got shot because she could not get hold of him after being informed by others that someone had been shot. She testified that she had developed this habit of immediately calling to check on her son's whereabouts following such news after Ms. Richard's car had been shot up the previous Halloween night. The State rested.

Defendant then called two of its own witnesses, J.K. and Jacob Landry ("Mr. Landry"). J.K.'s testimony for the defense was basically him affirming an affidavit in which he stated, in relevant part, "I never seen [Defendant] shot or shoot anyone." As previously discussed, the State used his testimony to play the video recording of his interview with police.

The second defense witness, Mr. Landry, was a prisoner in Vermillion Parish who may have been incarcerated with Defendant and who had a thirty-nine-old brother who allegedly also went by the name "Gutta." It was noted earlier in the trial that Mr. Landry was Defendant's friend and was the person who supplied Defendant's nickname "Villain" to detectives. Mr. Landry testified his brother moved to Houston shortly after graduating high school and was living in Kentucky at the time of trial. Mr. Landry testified that it had "been a while" since he had seen him and that the brother had not been back in Abbeville for "years[.]" It was not clear how many years this was before the 2023 trial or how close in proximity this visit was to the 2017 murder. The Defendant rested.

## ANALYSIS

*Defendant's Position:*

For his first assignment of error, Defendant asserts that the evidence is insufficient to prove beyond a reasonable doubt that Defendant was guilty of first

14

degree murder and attempted first degree murder. Defendant asserts misidentification because there was no physical evidence tying him to the shooting and because the only witness who was both at the scene and testified at trial asserted that he did not see Defendant. Defendant also asserts that there is insufficient evidence to suggest that he had the specific intent to kill J.K., as his first degree murder conviction and his attempted first degree murder conviction are both premised on his intent to kill J.K. as well as Dylan Plowden. Thus, Defendant asserts that there was insufficient evidence to support a first degree murder conviction on the basis that he had the specific intent to kill multiple people. Finally, Defendant asserts that the State did not meaningfully exclude the possibility that he engaged in self-defense.

*State's Position:*

The State counters that there was ample evidence tying Defendant to the murder, not least of which was Dylan's dying declaration; that specific intent to kill both Dylan and J.K. was sufficiently proven by the ten rifle rounds fired in their direction; and that Defendant's self-defense claim is deficient when the available evidence points to this shooting being an ambush.

### ***Relevant law and jurisprudence***

The analysis for sufficiency of the evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess [sic] the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel.*

15

> *Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The State is required "to negate any reasonable probability of misidentification" when the key issue in a case is the defendant's identity. *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051. However, "[p]ositive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibility of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted).

Louisiana Revised Statutes 14:30(A)(3) defines first degree murder as the killing of a human being when the offender has the specific intent to kill or to inflict great bodily harm upon more than one person. Louisiana Revised Statutes 14:27 defines attempt as when a person who, having specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object.

It is well settled that the act of pointing a gun in the direction of a person and firing the gun is an indication of the intent to kill that person. *State v. Holder*, 12-258 (La.App. 3 Cir. 11/7/12), 101 So.3d 1059, *writ denied*, 13-659 (La. 10/25/13), 124 So.3d 1091. Courts in this state routinely permit juries to infer specific intent to kill multiple persons when a defendant shoots a weapon in the direction of multiple people. *See State v. Brown*, 07-388 (La.App. 3 Cir. 10/3/07), 966 So.2d 1138, *writs denied*, 07-2159, 08-326 (La. 3/28/08), 978 So.2d 304, 312; *State v. Smith*, 31,955 (La.App. 2 Cir. 5/5/99), 740 So.2d 675, *writ denied*, 00-1404 (La. 2/16/01), 785 So.2d 840; *State v. Jones*, 43,963 (La.App. 2 Cir. 2/25/09), 4 So.3d 950, *writ denied*, 09-839 (La. 1/8/10), 24 So.3d 857.

The State has the affirmative burden of proving beyond a reasonable doubt that the homicide was not perpetrated in self-defense. *State v. Lynch*, 436 So.2d 567 (La.1983); *State v. Paddio*, 02-722 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, *writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682. In discussing the factors to be considered in examining a self-defense claim, this court has stated:

> "In examining a self-defense claim, it is necessary to consider: (1) whether the defendant reasonably believed that he was in imminent danger of death or great bodily harm; (2) whether the killing was necessary to prevent that death or great bodily harm; and (3) whether the defendant was the aggressor in the conflict." *State v. Mayes*, 14-683, pp. 2–3 (La.App. 3 Cir. 12/23/14), 154 So.3d 1257, 1259, *writs denied*, 15-178, 15-220 (La.11/16/15), 184 So.3d 24. Additionally, in determining whether the defendant had a reasonable belief that the killing was necessary, it is appropriate to consider "the excitement and confusion of the situation, the possibility of using force or violence short of killing, and the defendant's knowledge of the assailant's bad character." *State v. Thomas*, 43,100, p. 5 (La.App. 2 Cir. 4/30/08), 981 So.2d 850, 854, *writ denied*, 08-1276 (La. 2/6/09), 999 So.2d 769.

*State v. Fox*, 15-692, p. 4 (La.App. 3 Cir. 2/3/16), 184 So.3d 886, 890, *writ denied*, 16-404 (La. 3/13/17), 216 So.3d 800.

However, the defendant bears the burden of proving self-defense by a preponderance of the evidence in an attempted murder case. *State v. Wright*, 19-456 (La.App. 3 Cir. 12/18/19), 286 So.3d 1176, *writ denied*, 20-262 (La. 7/24/20), 299 So.3d 73.

### a. *Identity*

Defendant argues that there are significant evidentiary problems in this case, not least the potential for an accomplice and the lack of explanation for why the .40 caliber handgun cartridges were not found during the initial sweep of the crime scene. However, we find the evidence identifying Defendant and demonstrating intent to kill multiple persons was not among these problems. While the State is required to negate any reasonable probability of misidentification, positive

identification by a single witness is sufficient to support a conviction. *State v. Richardson*, 425 So.2d 1228 (La.1983) (citations omitted).

Here, not only was Defendant identified by two witnesses, but this is also one of the rare homicide cases where the victim himself was able to make such an identification in his dying declaration. While one of these witnesses, Greene, identified Defendant by his real name, the victim himself identified Defendant by a nickname, "Gutta." Additionally, numerous witnesses were able to identify Defendant by this nickname, including Defendant himself, with J.K.'s mother going as far to declare that "everyone" knew only one person who went by this nickname, "Gutta", and that was the Defendant. The jury, as the trier of fact, was within its rights to completely disregard the testimony of the one witness, J.K., who claimed that he did not see Defendant shoot Dylan. Additionally, we find that evidence of the alleged existence of a significantly older person who went by the same nickname, but who left the area years beforehand and lived in another state, does not undermine the credibility of this evidence and identification of Defendant as the shooter. Therefore, this does not form the basis for a reasonable hypothesis of innocence.

Thus, when viewing the evidence in light most favorable to the prosecution, we find that the State carried its burden of proof by providing sufficient evidence identifying Defendant as the person who shot Dylan.

b. *Specific intent to kill more than one person*

As to Defendant's intent to kill J.K., as well as Dylan, ten .17 caliber rifle rounds were fired in the direction of Dylan and J.K. by a shooter subsequently identified as Defendant. A plausible motive was supplied by testimony suggesting an ongoing violent dispute between Defendant and both Dylan and J.K. Although Defendant argues and reasons in his brief that "[s]urely if an individual with a rifle

18

wanted to shoot J.K. who was near [Dylan] when [Dylan] was shot, the individual could easily have done so even as J.K. ran away[,]" this is not an indication that Defendant lacked a specific intent to kill and could mean any number of things. After all, Dylan was likely an easier target to hit since he was apparently caught by surprise, hence why he was shot in the front, while J.K. claimed to have noticed the shooter in advance and quickly ran in a different direction. It is also possible Defendant is merely a poor shot.   Nevertheless, the jury was within its rights to infer a specific intent to kill J.K. and Dylan when Defendant fired multiple shots in J.K.  and Dylan's direction.

   c. *Self-defense*

Defendant's other argument under this assignment is his self-defense claim. This claim arises from the imputed hearsay statements of Greene, who allegedly said that J.K. fired the first shots at Defendant, which may or may not be related to the unexplained presence of the .40 caliber handgun rounds at the scene.

However, the fact finder is permitted to weigh the respective credibility of witnesses and accept those portions of testimony they deem valid, such as Greene's identification of Defendant at the scene, and discard the parts which do not make sense, i.e. that J.K. fired the first shot.  Additionally, the jury was within its rights to draw different conclusions, specifically finding, as to Greene's assertion, that Defendant rushed towards a rifle stashed in a nearby bush before opening fire, which would suggest that Defendant stashed the rifle there in advance of the confrontation.  Thus, the implications arising from that assertion are hard to square with the assertion that J.K. was really the initial aggressor, particularly when viewed alongside the other facts established at trial.  What is undisputed in this case is that Dylan did not fire the first shot at Defendant, and that the unarmed

Dylan was shot once from the front and two times from the back and that the shooter fired a rifle from the cover of nearby bushes.

Additionally, J.K's statements to police noted that Dylan was wearing headphones and did not acknowledge his attempts to warn him, which alongside the pattern of Dylan's gunshot wounds would strongly support the State's hypothesis to the jury that the shooter took Dylan by surprise. The weight of the evidence thus leans heavily towards this being a prepared ambush killing, which leaves little room for a plausible self-defense claim. Thus, viewing the evidence in light most favorable to the prosecution, we find Defendant's claim of self-defense to be without merit.

Therefore, and in summary, we find the evidence in this case is more than sufficient to support the jury's unanimous verdict finding Defendant guilty of first degree murder and attempted first degree murder.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2

For his second assignment of error, Defendant argues that the trial court erred when it denied his motions for new trial and post-verdict judgment of acquittal. These comprise two claims in his brief. First, he argues that the State failed to establish *corpus delicti*. Second, he asserts that there was the possibility of undue influence on juror members during their deliberations.[5] Defendant did not make these arguments in either his Motion for New Trial or his Post-Verdict Judgement of Acquittal, both filed on August 14, 2023. Instead, his Motion for a

---

[5] Defendant's summary of the argument also hints at two other potential claims, such as "the lack of a proper investigation by authorities, [and] the numerous errors committed at trial," but these were not addressed in his actual assignment of error. Pursuant to Uniform Rules–Courts of Appeal, Rule 2–12.4, we will not consider these claims due to the failure to properly brief the issues.

New Trial argued that the weight of evidence was insufficient to sustain his conviction while his Post-Verdict Motion of Acquittal argued that there was a lack of sufficient evidence regarding Defendant's identification as the shooter or the possibility of self-defense. In other words, the motions he submitted to the trial court were all sufficiency claims which have already been addressed as part of his first assignment of error. An additional claim concerning undue influence on jurors was discussed at length during the hearing on the motions, but, as shall be discussed below, it was fundamentally different than what Defendant is arguing before this court.

**<u>Corpus delicti</u>**

Defendant's first claim under this assignment of error is that the State did not prove *corpus delicti* for the murder of Dylan Plowden. Defendant failed to raise this issue in front of the trial court and thus did not preserve this issue for review on appeal. *State v. Revish*, 19-1732, pp. 6–7 (La. 10/20/20), 340 So.3d 864, 868. However, we will review this claim because the claim is comparable to a sufficiency claim and that claim was raised in his motions before the trial court.

The Louisiana Supreme Court, as to corpus delicti, has stated:

> In a homicide case, the corpus delicti consists of proof that the victim died and that the death was caused by a criminal act. This independent proof need not go to every element of the offense; and, it may be either direct or circumstantial in nature. The prosecution must show "that the injury specified in the crime occurred and that the injury was caused by someone's criminal activity."

*State v. Thibodeaux*, 98-1673, p. 12 (La. 9/8/99), 750 So.2d 916, 926, *cert. denied*, 529 U.S. 1112, 120 S.Ct. 1969 (2000).

Postmortem photographs of murder victims are admissible to prove *corpus delicti*, to corroborate other evidence establishing cause of death, as well as

21

location and placement of wounds, and to provide positive identification of the victim. *State v. Broaden*, 99-2124 (La. 2/21/01), 780 So.2d 349.

While the State failed to present the coroner for testimony or produce his autopsy report, the State did introduce into evidence photographs from the autopsy. These photographs include pictures of Dylan's corpse with clearly visible gunshot wounds to his chest, back leg, and hip area. A photograph was taken of the bullet recovered from one of these wounds, which was juxtaposed with a label showing Dylan's name and date of death. Pictures were also taken of Dylan's bloody clothing as well as fresh bloodstains from the road where Dylan had been laying on after being shot. Additionally, video footage was presented from the hospital showing Dylan's deteriorating physical state after getting shot and his identification of Gutta as the person who shot him. Finally, there was no allegation or evidence of suicide in this case.

Here, we find that there is more than sufficient evidence to prove that Dylan Plowden died because he was shot multiple times. There was evidence of both the placement and location of the shots to his body, along with the testimonies heard at trial that indicated someone shot Dylan. Accordingly, there is more than sufficient proof that the victim/Dylan's death by shooting was caused by a criminal act.

**Undue Influence**

Finally, and Defendant's second claim under this assignment concerns the alleged undue influence exerted on jury members during their deliberations by a courtroom deputy. Specifically, Defendant asserts that a private investigator talked with two jurors who both stated that a "Deputy Joseph Hebert" interfered with jury deliberations by controlling the jury room during deliberations, getting upset with any juror that did not return a guilty verdict, telling jurors to stick to the facts (i.e.

22

that the victim said Gutta's name) and ignore all other evidence, and by asserting that there was "no lesser charge" when other jurors wanted to ask the trial court for instructions regarding lesser charges. Accordingly, Defendant argues that his right to an impartial jury was violated due to the jury being subjected to influences which impacted their verdicts.

The record shows that a private investigator named Alex Montgomery was contacted by the defense to discuss with Defendant an incident that allegedly occurred after the trial. According to the investigator, Defendant told him that a deputy, identified as John C. Hebert, who was transporting him to Vermillion Parish Correctional Center showed Defendant his personal phone, which contained a text message from a juror asking the deputy if the deputy was satisfied with the verdict and whether the deputy was satisfied with the juror's performance. The investigator testified that he managed to talk to two jurors, Terry Bolden and Garren Brailey, who both said that a *juror* named Joseph Hebert "pretty much controlled the jury room" and may have done the other things Defendant described to the investigator, **not** Deputy Hebert, and that one of these two jurors claimed that although the *juror* was trying to influence them, he stuck to the rules and went with what instructions were given by the judge.

The record shows that juror Joseph Jacob Hebert and deputy John C. Hebert are not the same person and are not related. While the juror Hebert texted Deputy Hebert, *after the trial*, while Deputy Hebert was in the car with Defendant, that Deputy Hebert's phone was presented for examination, and the text messages were read aloud in court. The text turned out to say, "that was tough. What would you have done?" The response in the text message thread stated "[H]e's guilty. He's guilty bro. Y'all did the right thing. Thank y'all for y'all time." Deputy Hebert is

23

uncertain how Defendant would have seen this text and speculated that Defendant read a name on top of the text while looking over the deputy's shoulder.

Nevertheless, and most relevant to this issue, Deputy Hebert testified and denied discussing the case with juror Hebert or any other jurors during trial. While it was suggested early on that Defendant saw Deputy Hebert specifically talking to a juror, it was later clarified that the deputy spoke to all the jurors in his role as a deputy bailiff and that he did not have any specific conversation with any of them. Deputy Hebert further testified that he was the doorman, and he always said "thank you" to jurors as they walked by, but that he otherwise he had nothing to say to them before or during trial, and that he held no private conversations with any jurors. Additionally, and since such a claim was not actually made before the trial court, no such claim was preserved for review. *See Revish,* 340 So.3d at 868.

It also appears that Appellate counsel's misreading of the transcript and merging of the persons of the juror Hebert and Deputy Hebert fundamentally changes the argument and nature of the claim being asserted in this assignment of error. In front of the trial court, defense counsel argued that the deputy's alleged exchange with the juror created the appearance of impropriety when in fact the questioned jurors confirmed that it was juror Hebert and not Deputy Hebert, and when viewed in light of how much influence this particular juror had on deliberations, if any.

However, as discussed hereinabove, there was no specific allegation or evidence that the deputy specifically communicated to the jury about the case, nor influenced its deliberations, or that the deputy controlled or directed the juror Hebert or the jury. In its appeal brief to this court, appellate counsel now is arguing that the deputy personally and directly pressured the jurors. In doing so, Defendant erroneously conflated a juror, Hebert, with a deputy, Hebert.

24

Nevertheless, and to the contrary, a review of the record shows the Defendant has failed to present any evidence, much less sufficient evidence, to support this claim of any undue influence.

Accordingly, this assignment of error is without merit.

## DECREE

We affirm Defendant's convictions and sentences. We further instruct the trial court to amend the minutes of sentencing and the USCO to accurately reflect the trial court's order that only these sentences are to "run concurrent with each other."

**AFFIRMED.**